**Myra Holladay SIMS and Florida Import and Compliance Association, Plaintiffs–Appellees,**

v.

**STATE OF FLORIDA, DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES, Defendant–Appellant.**

No. 86–3055.

United States Court of Appeals, Eleventh Circuit.

Dec. 2, 1987.

---

Eric J. Taylor, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendant-appellant.

William C. Owen, Carlton, Fields, Ward, Emmanuel, George N. Meros, Tallahassee, Fla., amicus: Fla. Auto. Dealers Ass'n.

Susan Greco Tuttle, Moffitt, Hart & Miller, Tampa, Fla., amicus: Import Auto. Dealers of Florida, Inc.

Edward T. O'Donnell, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., amicus: Mercedes–Benz of North America, Inc.

Robert P. Smith, Jr., Tallahassee, Fla., for plaintiffs-appellees.

Before TJOFLAT and HATCHETT, Circuit Judges, and EATON *, District Judge.

HATCHETT, Circuit Judge.

The State of Florida, and the Department of Highway Safety and Motor Vehicles, appeal from the district court's declaration that Florida Statute § 320.02(9) is unconstitutional because it is preempted under the supremacy clause and violates the commerce clause of the United States Constitution. We affirm in part and remand.

## FACTS

On April 30, 1985, Myra Holladay Sims imported from Europe an automobile popularly known as a "gray market" automobile.[1] "Gray market" automobiles are imported automobiles which are not designed or manufactured to comply with United States emissions and safety standards. Florida Import and Compliance Association (FICA) is a trade association whose members are directly involved in the importation of gray market automobiles.

Two federal statutes govern the importation of foreign manufactured automobiles into the United States. The Clean Air Act, 42 U.S.C. § 7522, and the Safety Act, 15 U.S.C. § 1397, bar the importation of motor vehicles that do not comply with the applicable federal emissions and safety standards. Specifically, the Clean Air Act prohibits

> the sale, or the offering for sale, or the introduction, or delivery for introduction, into commerce, or (in the case of any person, except as provided by regulation of the Administrator), the importation into the United States, of any new motor vehicle or new motor vehicle engine, manufactured after the effective date of regulations under this part which are applicable to such vehicle or engine unless such vehicle or engine is covered by a certificate of conformity issued (and in effect) under regulations prescribed [by this statute].[2]

42 U.S.C. § 7522(a)(1). Also, under section 7522(b)(2), the statute provides that

> [t]he Secretary of the Treasury and the Administrator [of the Environmental Protection Agency (EPA) ] may, by joint regulation provide for deferring final determination as to admission and authorizing the delivery of such a motor vehicle

---

* Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Sims purchased the used 1976 Mercedes Benz 450 SEL from Ulrich Kieserwalter of Bonn, West Germany.

2. The definition of "new car" under the Clean Air Act as it relates to gray market automobiles is not based on whether the automobile has previously been sold prior to its importation into the United States:

> (3) Except with respect to vehicles or engines imported or offered for importation, the term 'new motor vehicle' means a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser; and the term 'new motor vehicle engine' means an engine in a new motor vehicle or a motor vehicle engine the equitable or legal title to which has never been transferred to the ultimate purchaser; *and with respect to imported vehicles or engines, such terms mean a motor vehicle and engine, respectively, manufactured after the effective date of a regulation issued under section 7521 of this title which is applicable to such vehicle or engine (or which would be applicable to such vehicle or engine had it been manufactured for importation into the United States).*

42 U.S.C. § 7550(3) (emphasis added).

or engine offered for import to the owner or consignee thereof upon such terms and conditions (including the furnishing of a bond) as may appear to them appropriate to ensure that any such motor vehicle or engine will be brought into conformity with the standards, requirements, and limitations applicable to it under this part. The Secretary of the Treasury shall, if a motor vehicle or engine is finally refused admission under this paragraph, cause disposition thereof in accordance with the customs laws unless it is exported, under regulations prescribed by such Secretary, within ninety days of the date of notice of such refusal or such additional time as may be permitted pursuant to such regulations, except that disposition in accordance with the customs laws may not be made in such manner as may result, directly or indirectly, in the sale, to the ultimate customer, of a new motor vehicle or new motor vehicle engine that fails to comply with applicable standards of the Administrator under this part.

Similarly, the Safety Act provides that "[n]o person shall manufacture for sale, sell, offer for sale, or introduce or deliver for introduction in interstate commerce, or import into the United States, any motor vehicle [unless it is in conformity with applicable federal motor vehicle safety standards]." 15 U.S.C. § 1397(a)(1)(A). In addition, that statute provides as follows:

> [T]he Secretary of the Treasury and the Secretary [of the National Highway Transportation Safety Administration, Department of Transportation (DOT)] may, by ... regulations, provide for authorizing the importation of such motor vehicle or item of motor vehicle equipment into the United States upon such terms and conditions (including the furnishing of a bond) as may appear to them

appropriate to ensure that any such motor vehicle or item of motor vehicle equipment will be brought into conformity with any applicable federal motor vehicle safety standard prescribed under this subchapter, or will be exported or abandoned to the United States.

15 U.S.C. § 1397(b)(3).

Despite general prohibitions against the importation of nonconforming motor vehicles into the United States, Congress, under the above provisions, authorized the importation of gray market vehicles upon the furnishing of a bond or other means of assuring that federal environmental and safety laws are not unlawfully circumvented. The EPA, the DOT, and the Treasury Department promulgated regulations governing the importation of gray market vehicles. *See generally* 19 C.F.R. §§ 12.73, 12.80; 40 C.F.R. Part 85, Subpart P and 49 C.F.R. Part 571. Under these regulations, a gray market vehicle is conditionally admitted into the United States for the limited purpose of enabling the importer to comply with federal emissions and safety laws. The importer must post an entry bond with the United States Customs Service (Customs) for an amount equal to the value of the vehicle plus the customs duty. *See* Automobile Importers Compliance Association, *Handbook of Vehicle Importation*, 21 (1984). In addition, the importer must sign a statement indicating that the motor vehicle "is not covered by a certificate of conformity with federal motor vehicle emission standards but will be brought into conformity with such standards." 19 C.F.R. § 12.73(b)(5)(x) (1986). Finally, the importer must declare that the vehicle "was not manufactured in conformity [with] all applicable safety standards, but it has been or will be brought into conformity." 19 C.F.R. § 12.80(b)(1)(iii).[3]

---

**3.** Title 19 C.F.R. § 12.80(b)(1)(iii) reads as follows:

(b) *Requirements for entry and release.*

(1) [E]ach vehicle ... offered for introduction into the Customs territory of the United States shall be denied entry unless the importer or consignee files with the entry a declaration, in duplicate, which declares or affirms one of the following:

....

(iii) The vehicle or equipment item was not manufactured in conformity [with] all applicable safety standards, but it has been or will be brought into conformity. Within 120 days after entry, or within a period not to exceed 180 days after entry, if additional time is granted by the Administration, National Highway Traffic Safety Administration ("Adminis-

The entry bond serves as a means to enforce the importer's obligation to comply with the requirements of federal emission and safety standards. Thus, Customs will not release the bond until it receives assurance from the EPA and the DOT that the importer has complied with the standards. *See* 19 C.F.R. §§ 12.73c and 12.80e.

When Sim's automobile arrived at port in Jacksonville, Florida, she complied with all of the applicable federal regulations governing the importation of gray market automobiles, which included posting a bond in the requisite amount. Sims was exempt from conforming her automobile to the applicable federal emission standards and received a letter from the EPA releasing the EPA obligation on the bond.[4] In complying with the Safety Act and the DOT regulations, Sims completed the requirements under 19 C.F.R. § 12.80(b)(1)(iii).

In 1984, the Florida legislature passed the following statute concerning automobile titling and registration:

> Before a motor vehicle which has not been manufactured in accordance with the federal Clean Air Act and the federal Motor Vehicle Safety Act can be sold to a consumer and titled and registered in this state, the motor vehicle must be certified by the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency to be in compliance with these federal standards. A vehicle which is registered pursuant to this subsection shall not be titled as a new motor vehicle.

Act approved June 11, 1984, ch. 84–155, § 3, 1984 Fla.Laws 457, 458 (codified as amended at Fla.Stat. § 320.02(9) (1985)). This provision prevents the owner of a gray market vehicle from acquiring title and vehicle registration in Florida until the owner has obtained the required documentation from the federal government.

Subsequent to the passage of Fla.Stat. § 320.02(9), Sims unsuccessfully sought to title and register her automobile at the Florida Department of Highway Safety and Motor Vehicles (DMV). The DMV refused to title and register Sims's automobile because she did not produce release letters from the DOT and Customs certifying compliance with federal standards. Sims had not received a bond release letter from the DOT because of the excessive number of forms the DOT had to review.[5]

Following refusal to title and register the automobile, Sims and the FICA filed suit in United States District Court for the Northern District of Florida alleging that the state's enforcement of section 320.02(9) violated the supremacy and commerce clauses of the United States Constitution: (1) the Clean Air Act and the Safety Act preempt the state's authority to require compliance with federal emission and safety standards, and (2) enforcement of section 320.02(9) places an impermissible burden on foreign and interstate commerce. The district court concluded that the Clean Air Act and Safety Act preempt the state's authority to enforce section 320.02(9) and that enforcement of the statute would violate the commerce clause. The district court declared section 320.02(9) unconstitutional and en-

---

trator, NHTSA"), the importer or consignee will submit a true and complete statement to the Administrator, NHTSA, identifying the manufacturer, contractor, or other person who has brought the vehicle or equipment item into conformity, describing the exact nature and extent of the work performed, and certifying that the vehicle or equipment item has been brought into conformity, and that the vehicle or equipment item will not be sold or offered for sale until the Administrator, NHTSA, issues an approval letter to the district director stating that the vehicle or equipment item described in the declaration has been brought into conformity with all applicable safety standards.

19 C.F.R. § 12.80(b)(1)(iii).

**4.** The importer of a vehicle, more than five years old and imported for personal use and not for resale, is entitled to a once-in-a-lifetime exemption from the Clean Air Act's emission standards. The exemption is granted automatically by the EPA, but the importer is still required to comply with the requirements of the Safety Act and the DOT. In addition, the importer is not permitted to sell the vehicle for two years after importation. *See generally* United States EPA, *Automotive Imports—Fact Sheet* 76 (1983).

**5.** In July, 1985, the DOT had 14,000 compliance forms to review.

joined its enforcement. The state brings this appeal from the district court's ruling.

On September 29, 1986, we heard oral arguments addressing whether Fla.Stat. § 320.02(9) violates the supremacy and commerce clauses of the United States Constitution. On February 18, 1987, we requested "all counsel of record" to submit supplemental briefs addressing (1) standing, (2) Florida's sovereign immunity under the eleventh amendment, and (3) mootness. The parties complied with our request.[6]

### DISCUSSION

#### A. Standing

■ The state of Florida alleges that Sims and the FICA lack standing to challenge the constitutionality of Fla.Stat. § 320.02(9) because they have failed to show (1) a judicially cognizable injury traceable to the enforcement of the statute, and (2) the likelihood of redress if the Florida statute is declared preempted or in violation of the commerce clause. "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In order to satisfy the requirements of standing, a plaintiff must allege a personal injury fairly traceable to the challenged conduct and a likelihood of redress by the requested relief. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ Sims and the FICA allege that the state's enforcement of Fla.Stat. § 320.02(9) violates the supremacy and commerce clauses of the United States Constitution because it prevents the owner of a "gray market" vehicle from acquiring title and registration in Florida prior to release of the entry bond and final admission of the vehicle into the United States.

We note that whether the appellees have sufficiently alleged standing is not determined by the likelihood that they will prove what has been alleged. The Supreme Court's ruling in *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206, requires the courts to "accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party." *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed. 2d 66 (1979). In satisfying the initial requirement under the Article III doctrine relating to standing—an allegation of "a distinct and palpable injury," *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. Sims and the FICA's complaints allege that the state's enforcement of section 320.02(9) unlawfully prevents the titling and registering of gray market vehicles in Florida. In assuming, as we must, the truth of the allegations, the state's *unlawful* refusal to issue titles and registrations to owners of gray market vehicles constitutes a distinct, palpable, and personal injury to Sims and the FICA.

Also, Sims's and the FICA's complaints contain assertions sufficient to establish the second requirement necessary to show standing—the likelihood of redress by the requested relief. Absent the state's enforcement of section 320.02(9), Sims and other owners of gray market vehicles would immediately have their vehicles titled and registered in Florida. *Federal statutes do not prohibit the titling and registering of gray market vehicles prior to final admission; similarly, the DOT does not prohibit the operation of gray market vehicles on public highways prior to the issuance of a release letter.*[7] Only

---

**6.** In addition to complying with our request, the parties bombarded the court with frequent, profuse, numerous, and sundry motions and pleadings. The motions not directly ruled upon in this opinion are denied.

**7.** The DOT's February, 1985, general report to the appropriations committees included the following:

Claims have been made and evidence presented to the agency that there are many vehicles supposedly brought into conformance with the safety standards that, upon inspection, are not in conformance with the standards. There are several reasons for the presence of noncomplying vehicles in the mainstream of the vehicle population, some of which are fully lawful. Nonconforming vehicles in the general vehicle population because of unlaw-

the EPA, under Title 40 C.F.R. § 85.1507 (1985), requires that gray market vehicles "be stored and . . . not . . . operated on the public highways [prior to] final admission."[8] The state's argument is that since Sims and other owners of gray market vehicles are prohibited by section 85.1507 from operating such vehicles on the state roads until final admission is granted, they have no reason to seek titling and the registration of these vehicles. Such a contention amounts to mere speculation as to the owner's need for, or the reason for which the owner seeks titling and registration. Moreover, Fla.Stat. § 320.02(1) does not *prohibit* the registration of vehicles that are not operated on Florida roads. We cannot conclude that titling and registration of a gray market vehicle are necessary only for the operation or sale of the automobile.[9] In this case, we also find that Sims and the FICA have sufficiently alleged a distinct, palpable, and personal injury in the state's enforcement of Fla.Stat. § 320.02(1). "There is [a] casual connection between the asserted injury and the conduct being challenged." *Allen v. Wright,* 468 U.S. 737, 770, 104 S.Ct. 3315, 3334, 82 L.Ed.2d 556 (1984) (noting *Simmon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)). We hold that this lawsuit presents a "case or controversy" as required by article III of the United States Constitution and does not constitute a "hypothetical case." Sims and FICA have standing to bring this lawsuit.

## B. Preemption

Sims and the FICA successfully challenged the constitutionality of Fla.Stat. § 320.02(9) in the district court. The district court held that the Clean Air Act and Safety Act preempt the state's authority to require compliance with federal emission and safety standards. Federal preemption of state law is derived from the supremacy clause of article IV, clause 2 of the United States Constitution, which reads as follows:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.

The Supreme Court in *Michigan Canners and Freezers Association, Inc. v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) stated the three ways in which federal law may preempt state law.

> Federal law may preempt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. [Citation omitted.] Second, even in the absence of express preemptive language, Congress may indi-

---

ful activity are of concern to NHTSA and form the basis of many penalty recommendations. The reasons for nonconforming vehicles being present in the general vehicle population are:

. . . .

3. The vehicle was entered under bond conditional upon its being brought into conformity within 120 days after entry or within 180 days when an extension is granted. The vehicle cannot be sold prior to release of the bond but can be used on the highways prior to completion of the modifications and its subsequent release. However, more than 7 states do not allow a vehicle to be titled and registered until the vehicle has been released by NHTSA.

NHTSA, *Importation of Motor Vehicles and Items of Motor Vehicle Equipment,* 19 C.F.R. § 12.80 (Feb. 1985).

**8.** Section 85.1507 reads as follows:

Storage and Prohibited Operation or Sale of Vehicles or Engine Conditionally Admitted
A motor vehicle or engine conditionally admitted pursuant to section 85.1503, section 85.1504, or section 85.1505 shall be stored and shall not be operated on the public highways or sold until such vehicle or engine has been granted final admission. Failure to comply with this provision shall constitute a violation of section 203(a)(1) of the Clean Air Act, as amended.

**9.** A possible alternative need the owner of a gray market vehicle may have for a certificate of title is the securing of bank financing to assist in the purchasing of the automobile.

cate an intent to occupy an entire field of regulation, in which case the states must leave all regulatory activity in that area to the federal government. [Citations omitted.] Finally, if Congress has not displaced state regulation entirely, it may nonetheless preempt state law to the extent that the state law actually conflicts with federal law.

*Michigan Canners,* 467 U.S. at 469, 104 S.Ct. at 2523.

In *Howard v. Uniroyal, Inc.,* 719 F.2d 1552, 1555 (11th Cir.1983), we "acknowledge[d] the well established principle that the touchstone of preemption analysis is congressional intent. . . ." Additionally, "[t]he intent of Congress to pre-empt a state law may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Howard,* 719 F.2d at 1556 (citing *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)).

The Clean Air Act contains the following preemptive provision regarding state enforcement of federal emission standards:

> No state or any political subdivision thereof shall adopt of attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicles engines subject to [the vehicle emission standards of the Clean Air Act]. No state shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). The express language in section 7543(a) indicates Congress's intent to exclusively regulate the control of emissions from new motor vehicles prior to

the initial sale. *See Michigan Canners,* 467 U.S. 461, 104 S.Ct. 2518.

■ The state contends that Fla.Stat. § 320.02(9) simply ensures that new automobiles coming onto Florida's highways comply with the Clean Air Act; it does not establish new or conflicting emission standards. Although this contention may be based on proper and wholesome intentions, nevertheless, Congress specifically stated that "[n]o state . . . shall adopt *or attempt to enforce* any [federal or state] standard relating to the control of emissions from new motor vehicles" prior to the initial sale. 42 U.S.C. § 7543(a) (emphasis added). Thus, we agree with the district court's ruling and hold that "[e]nforcement of the Clean Air Act before [the] first sale [of new motor vehicles] is the sole and exclusive prerogative of the federal government." [10]

■ The Safety Act likewise contains a preemptive provision which reads in part as follows:

> Whenever a federal motor vehicle safety standard established under this subchapter is in effect, no state or political subdivision of a state shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the federal standard.

15 U.S.C. § 1392(d). Unlike the preemptive provision contained in the Clean Air Act, 15 U.S.C. § 1392(d) precludes states from enforcement of safety standards *only* when such standards are not identical to federal standards.

The district court held that prior to the first sale of a motor vehicle, "[t]he states are absolutely barred from acting in any manner whatsoever in" enforcing federal

---

**10.** The district court additionally noted that section 7543(d) of the Clean Air Act further indicates Congress's intent to exclusively enforce federal emission standards relating to new automobiles before their initial sale since the statute specifically allows the state to regulate automobile use and operation *subsequent to* the initial

sale. Title 42 U.S.C. § 7543(d) reads as follows: "Nothing in this part shall preclude or deny to any state or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of *registered or licensed motor vehicles.*" [Emphasis added.]

safety standards and that "the role of the states in enforcing the federal laws and regulations is confined solely to the period *after* the first sale of an automobile." We disagree.

Section 1392(d) does not expressly preclude states from requiring proof of compliance with federal safety standards before obtaining title and registration for gray market automobiles. In *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 714, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714, 722 (1985), the United States Supreme Court stated that "[t]he question whether the regulation of an entire field has been reserved by the federal government is, essentially, a question of ascertaining the intent underlying the federal scheme." Congress enacted the Motor Vehicle Safety Act to establish uniform federal safety standards. *See* H.R. 1776, 89th Cong., 2d Sess. 17 (1966), U.S.Code Cong. & Admin.News 1966, p. 2709. Section 1392(d), as originally enacted, restricted federal enforcement of safety standards to the initial sale of new vehicles and permitted state enforcement of safety standards identical to corresponding federal standards after the first sale of new vehicles. S.Rep. No. 1301, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Cong. & Admin.News 2709, 2720.

Also, the District Court for the Middle District of Pennsylvania in *Truck Safety Equipment Institute v. Kane*, 466 F.Supp. 1242 (M.D.Pa.1979), held that state safety standards identical to federal standards were preempted because the intent of Congress was to preclude states from presale enforcement of federal safety standards. The court in *Kane,* however, noted that the standards derived under the Pennsylvania

system required independent testing and the payment of fees to cover the cost of such testing. *Kane,* 466 F.Supp. at 1245–46. Unlike the Pennsylvania regulations examined in *Kane,* Fla.Stat. § 320.02(9) does not impose additional requirements on the importer of a gray market vehicle than those imposed by the applicable federal standards.

In 1982, the National Highway Traffic Safety Administration (NHTSA) issued an opinion in an attempt to interpret the extent to which section 1392(d) preempted state enforcement of federal safety standards. Federal Motor Vehicle Safety Standards: Interpretation Regarding Preemption and Presale State Enforcement of Safety Standards, 47 Fed.Reg. 884 (Advisory Letter) (1982). In its interpretation, the NHTSA stated:

> [I]t is the position of the NHTSA that any state requirement which necessitates that manufacturers pay fees in order to obtain approval under a state standard identical to an FMVSS [Federal Motor Vehicle Safety Standard], and any imposition of requirements for approval which has the effect of prescribing the sale of equipment certified under the Act to a standard such as FMVSS 218 would be preempted by operation of the Act and of the agency's action in adopting the federal standard in question.

47 Fed.Reg. at 885.

Recently, the Fifth Circuit in *Direct Automobile Importers Association, Inc. v. Townsley,* 804 F.2d 1408 (5th Cir.1986), examined a Texas statute similar in language to Fla.Stat. § 320.02(9) and stated: [11]

> H.B. 1805 places no burden on the manufacturer, which was clearly the concern

---

11. Texas statute, H.B. 1805 provides as follows: Before a motor vehicle not manufactured for sale or distribution in the United States may be *registered and titled* in Texas, the applicant shall furnish to the designated agent: (1) a bond release letter, with all attachments, issued by the United States Department of Transportation acknowledging receipt of a statement of compliance submitted by the importer of the vehicle and that the statement meets the safety requirements of 19 C.F.R. 12.80(e); and (2) a bond release letter, with all attachments, issued by the United States

Environmental Protection Agency stating that the vehicle has been tested and shown to be in conformity with federal emission requirements; and (3) a receipt of certificate issued by the United States Department of Treasury showing that any and all gas guzzler taxes due on the vehicle under the provisions of Pub.L. No. 95–618, Title II, Section 201(a) (16 U.S.C. A. 4064) have been fully paid; or (4) proof satisfactory to the agent that the vehicle was not brought into the United States from outside the country. [Emphasis added.]

behind the interpretation. H.B. 1805 does not involve the payment of any fees, nor does it have the effect of prescribing the sale of federally certified equipment. Indeed, H.B. 1805 does not require any certification except federal certification by federal authorities. As best we can tell, the original pre–1982 amendment provision was enacted to assure uniformity of standards for manufacturers so vehicles and equipment meeting the federal standards could be sold freely in any state. *See* remarks of Senator Magnuson (one of the NHTSA's sponsors), 112 Cong.Rec. S14230 (daily ed. June 14, 1966) (remarks of Senator Magnuson). The Texas statute H.B. 1805, does not impair this objective since it creates no independent state standard or certification of the automobiles.

*Townsley,* 804 F.2d at 1414. The same rationale holds true in this case regarding Fla.Stat. § 320.02(9). As noted above, Fla. Stat. § 320.02(9) neither imposes additional requirements or burdens on the manufacturer or importer, nor involves the payment of additional fees. Additionally, section 320.02(9) does not have the effect of prescribing the sale of federally certified equipment, or impairing the objective of Congress in establishing uniform federal safety standards to permit the free marketability of vehicles in all states.

In 1982, Congress amended section 1392(d) by adding the following sentence to the end of the provision: "Nothing in this section shall be construed as preventing any state from enforcing any safety standard which is identical to a federal safety standard." 15 U.S.C. § 1392(d) (1982). The Senate issued a report on the amendment which reads in part as follows:

> The committee intends that states are not preempted from enforcing safety standards identical to federal standards which they have adopted. States may not require [state] certification or approval of motor vehicles or motor vehicle equipment. However, state enforcement may be carried out according to applicable state laws. States may undertake independent testing, and also may require manufacturers to submit adequate test data *concurrent with the first sale or thereafter.*

S.Rep. No. 505, 97th Cong., 2d Sess. 6, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3169, 3174.

In *Georgia Automobile Importers Compliance Association, Inc. v. Bowers,* 639 F.Supp. 352 (1986), the District Court for the Northern District of Georgia addressed the constitutionality of Georgia statutes O.C.G.A. §§ 40–2–25.1 [12], 40–3–29.1 [13], and 16–9–110 [14] (1985) in light of 15 U.S.C.

12. Section 40–2–25.1 provides that:
(a) No application shall be accepted and no certificate of registration shall be issued to any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the 'Clean Air Act,' ... and as required by ... the 'National Traffic and Motor Safety Act,' ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards and unless all documents required by the Department of Revenue for processing an application for a certificate of registration or title are printed and filled out in the English language or are accompanied by an English translation.
O.C.G.A. § 40–2–25.1(a) (1985).

13. Section 40–3–29.1 states that:
[N]o application shall be accepted and no certificate of title shall be issued to any motor

vehicle which was not manufactured to comply with federal emission and safety standards applicable to new motor vehicles as required by ... the 'Clean Air Act' ... and as required by the 'National Traffic and Motor Safety Act,' ... unless and until the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards and unless all documents required by the Department of Revenue for processing an application for a certificate of registration or title are printed and filled out in the English language or are accompanied by an English translation.
O.C.G.A. § 40–3–29.1 (1985).

14. Section 16–9–110 provides that:
(a) It shall be unlawful for any person, firm, or corporation knowingly to sell, transfer, or otherwise convey any motor vehicle which was not manufactured to comply with federal emission and safety standards applicable to

§ 1392(d) (1982). In reviewing the legislative history of section 1392(d), the district court noted several statements made on the floor of the House of Representatives when the bill was passed indicating congressional intent. Representative Wirth stated that "[a] recent court case and NHTSA opinion have changed the scope of traditional state enforcement." 128 Cong. Rec. H3438 (daily ed. June 14, 1982) (remarks of Rep. Wirth). Representative Moorhead considered the amendment to affirmatively declare states as having a role in enforcing federal safety standards. *See* 128 Cong.Rec. H3439 (daily ed. June 14, 1982) (remarks of Rep. Moorhead). In addition, Representative Dingell stated in regard to section 1392(d), as amended, that "states may undertake independent testing of vehicles or equipment and may require manufacturers to submit adequate data *concurrently with the first sale* within a state, or thereafter." 128 Cong.Rec. H3440 (daily ed. June 14, 1982) (remarks of Rep. Dingell).

We agree with the court's conclusion in *Townsley* that "the legislative history shows an intent to preempt state presale enforcement of federal standards where the sale of federally certified equipment is impaired by an independent state compliance system." *Townsley*, 804 F.2d at 1415. Fla.Stat. § 320.02(9) does not create an impairment to the enforcement of federal safety standards or frustrate the intent of Congress in establishing uniformity of standards for manufacturers of vehicles; consequently, we hold that 15 U.S.C. § 1392(d) (1982) does not preempt Fla.Stat. § 320.02(9) (1985).

## C. Commerce Clause

The district court concluded that since Fla.Stat. 320.02(9) prevents owners of gray market vehicles from titling and registering their vehicles prior to presenting proof of compliance with federal emission and safety standards, the marketability of gray

market vehicles is limited and prevents their free introduction into the stream of commerce.

The commerce clause of the United States Constitution reads in part as follows: "The Congress shall have the power to regulate commerce with foreign nations, and among the several states...." U.S. Const. art I, § 8, cl. 3. In determining whether Fla.Stat. § 320.02(9) is violative of the commerce clause, we must (1) determine exactly what interest the statute purports to protect, (2) determine whether the statute burdens commerce, and if so, to what extent, and (3) balance the weight and nature of the interests protected by the statute against the extent to which it imposes a burden on commerce. *See generally Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981).

In addressing the extent to which states may create laws affecting commerce, the Supreme Court has held that:

> The commerce clause does not ... invalidate all state restrictions on commerce. It has long been recognized that, 'in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.' [Citation omitted.] The extent of permissible state regulation is not always easy to measure. It may be said with confidence, however, that a state's power to regulate commerce is never greater than in matters traditionally of local concern. [Citation omitted.] For example, regulations that touch upon safety—especially highway safety—are those that 'the Court has been most reluctant to invalidate.' [Citations omitted.] Indeed, 'if safety justifications are not illusory, the Court will not second guess legislative judgment about their importance in

---

new motor vehicles as required by ... the 'Clean Air Act,' ... and the 'National Traffic and Motor Safety Act,' ... unless and until the United States Customs Service or the United States Department of Transportation and the

United States Environmental Protection Agency have certified that the motor vehicle complies with such applicable federal standards. O.C.G.A. § 16–9–110(a) (Supp.1985).

comparison with related burdens on interstate commerce.' [Citation omitted.] Those who would challenge such bona fide safety regulations must overcome a 'strong presumption of validity.' [Citation omitted.]

*Kassel*, 450 U.S. at 669–70, 101 S.Ct. at 1315–16.

The objective of Fla.Stat. § 320.02(9) is to ensure that gray market vehicles comply with federal emission and safety standards before receiving titles and registration in Florida. Fla.Stat. § 320.02(9) advances a legitimate and local concern for the health and safety of the state's citizens in that it attempts to prevent the sale and operation of vehicles in Florida that are not considered safe for persons and the environment under federal standards.

We must now determine the extent to which Fla.Stat. § 320.02(9) burdens commerce. Section 320.02(9) imposes restrictions on the importation of gray market vehicles into the United States. We agree with the district court that:

The statute prevents the titling and registration of vehicles which in turn limits the marketability of the cars. To force an importer to use a different port of entry, for example, Savannah, Georgia, or Mobile, Alabama, in order to receive registration and titles from the relevant state authorities without having to endure the trials and tribulations that Florida has erected in their path destroys the common market of commerce for the entire United States as established by the Constitution. It is precisely this type of state action that the Commerce Clause was designed to prevent; thus the statute is constitutionally infirm.

Accordingly, in weighing the local concerns of section 320.02(9) against the burden on commerce, we find that Fla.Stat. § 320.02(9) does violate the commerce clause. Although Fla.Stat. § 320.02(9) requires no greater compliance than compliance with applicable federal standards, Florida's titling and registration statute imposes a burden on foreign and interstate commerce. The Florida Statute directs the stream of commerce in gray market ve-

hicles from Florida to other states for those owners who have legitimate reasons for registering and titling their vehicles before being able to use them on the roads of Florida.

### D. Immunity

Sims and the FICA filed suit in the district court against the State of Florida, Department of Highway Safety and Motor Vehicles, and the Attorney General seeking to enjoin the enforcement of Fla.Stat. § 320.02(9). Thereafter, Sims and the FICA filed a motion (which was not contested) to dismiss the Attorney General as a defendant in the case. The Director of the Division of Motor Vehicles, Florida Department of Highway Safety and Motor Vehicles, was never included as a party defendant. Thus, the only remaining party defendants in the present action are the State of Florida and one of its agencies— the Department of Highway Safety and Motor Vehicles. "It is clear ... that in the absence of consent a suit in which the state or one of its agencies or departments is named as the defendant is prescribed by the eleventh amendment." *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984).

The state of Florida, in responding to the constitutional challenge to Fla.Stat. § 320.02(9), failed to plead the defense of sovereign immunity under the eleventh amendment and did not initially raise the issue on appeal. Nonetheless, "[T]he eleventh amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974). Moreover, Florida's constitution requires "specific, clear, and unambiguous language in a statute to constitute a waiver of sovereign immunity." *Manatee County v. Town of Longboat Key*, 365 So.2d 143, 147 (Fla.1978). In our review of Florida law, we have found no legislative enactment waiving the state's sovereign immunity under the facts and issues in this case.

The state of Florida asserted the defense of sovereign immunity in this case only after this court requested that the parties brief the issue. Sims and the FICA contend that this court unwarrantedly raised the eleventh amendment defense, citing *Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 2567 n. 19, 73 L.Ed.2d 172 (1982): "[W]e have never held that [the eleventh amendment defense] is jurisdictional in the sense that it must be raised and decided by this court on its own motion." Although we do not interpret *Patsy* as prohibiting this court from raising the issue of sovereign immunity, we do recognize the inequity in allowing the state to now assert the defense of sovereign immunity without affording Sims and the FICA an opportunity to effectively counter the defense at this stage in the litigation.[15] After reviewing Florida law on sovereign immunity and the procedural position in which the parties are caught we remand (as we did in *Patsy*) this issue to the district court to determine whether Sims and the FICA should be granted leave to add an appropriate party in light of the state's untimely and compelled assertion of the sovereign immunity defense.

### E. Mootness

Amicus curiae Mercedes Benz of North America, Incorporated, raised the issue of mootness in this case because Myra Sims has now received final admission of her automobile. The FICA remains a party in the present action with a continuing interest in the outcome. Moreover, the state concedes that Sims and the FICA's claim is not moot: "The issue ... is one that is capable of repetition yet evading review." We agree with this conclusion and accordingly hold that the present action is not moot.

### CONCLUSION

In summary, we affirm the district court's finding that Fla.Stat. § 320.02(9) vi-

olates the Clean Air Act, 42 U.S.C. § 7522 because Congress has reserved to the federal government the sole and exclusive prerogative of enforcing federal emission standards. We also affirm the district court's ruling that Fla.Stat. § 320.02(9) violates the commerce clause, U.S. Const. art. I, § 8, cl. 3. Also, we remand to the district court the sole issue of whether Sims and the FICA should be granted leave to add an additional party or parties in this case. Accordingly, we affirm in part and remand for further proceedings consistent with this opinion.

AFFIRMED in part and REMANDED

TJOFLAT, Circuit Judge, dissenting:

### I.

A "gray market" automobile is an automobile manufactured for use outside the United States, and is generally not designed and built to comply with federal emission and safety standards. Purchasers buy these automobiles overseas, import them into the United States, and modify or convert them to comply with federal emission and safety standards.

In 1984, the Florida legislature passed the following law concerning automobile titling and registration:

> Before a motor vehicle which has not been manufactured in accordance with the federal Clean Air Act and the federal Motor Vehicle Safety Act can be sold to a consumer and titled and registered in this state, the motor vehicle must be certified by the United States Customs Service or the United States Department of Transportation and the United States Environmental Protection Agency to be in compliance with these federal standards. A vehicle which is registered pursuant to this subsection shall not be titled as a new motor vehicle.

Fla.Stat. § 320.02(9) (Supp.1987) (enacted prior to amendment as Act approved June

---

**15.** Sims and the FICA moved this court to allow the addition of Charles J. Brantley as a party defendant, or in the alternative, to temporarily relinquish jurisdiction to the district court so that they might seek to add Brantley as a party defendant. The matters to be weighed in ruling on such a motion can better be considered in the district court.

11, 1984, ch. 84–155, § 3, 1984 Fla.Laws 457, 458). This provision prevents the owner of a gray market automobile from acquiring title and vehicle registration in Florida until he obtains the required documentation from the federal government.

The appellees in this action are the Florida Import and Compliance Association (FICA) and Myra Holladay Sims. FICA is a trade association whose members are directly involved in various aspects of the importation of gray market automobiles. Sims, the owner and importer of a gray market automobile, sought unsuccessfully to title and register her automobile in Florida. Officials from the Florida Department of Highway Safety and Motor Vehicles refused to title and register Sims' automobile because she did not produce proof of compliance with section 320.02(9). Appellees subsequently brought suit in federal district court against the Florida Department of Highway Safety and Motor Vehicles,[1] claiming that the State's enforcement of section 320.02(9) violated the supremacy and commerce clauses[2] of the United States Constitution because (1) the Clean Air Act, 42 U.S.C. §§ 7401–7642 (1982), and the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381–1431 (1982) (the Safety Act), preempt the State's authority to require compliance with federal emission and safety standards; and (2) enforcement of section 320.02(9) places an impermissible burden on foreign and interstate commerce. Appellees asked the court to declare section 320.02(9) unconstitutional and to enjoin its enforcement.

After a bench trial, the district court concluded that the Clean Air Act and the Safety Act preempt the State's authority to enforce Fla.Stat. § 320.02(9), and that such enforcement would violate the commerce clause. The court therefore granted appellees' application for a permanent injunction, and enjoined the State from enforcing its statute. The State now appeals from the district court's rulings.

The majority holds that both Sims and FICA have standing to challenge Fla.Stat. § 320.02(9), *ante* at 1563–64, and that neither party's cause of action is moot. *Ante* at 1570. The majority reaches the merits of the dispute and holds that the Florida statute is preempted by the Clean Air Act, *ante* at 1564–65, but not the Safety Act, *ante* at 1565–68, and that the Florida statute violates the commerce clause. *Ante* at 1568–69. The majority, however, remands the case for further findings regarding the State of Florida's eleventh amendment defense. *Ante* at 1569–70.

Because I believe that both Sims and FICA lack standing to challenge the Florida statute, I respectfully dissent. I also believe that Sims' cause of action is moot and no longer reviewable. Because of appellees' mootness and standing problems, I should decline to address the merits of their claims. Nonetheless, I am compelled to respond to the majority's conclusion that section 320.02(9) violates the commerce clause. The majority fails to recognize that Congress can delegate its commerce clause power to the states. Consequently, the majority unduly limits the power of the states to regulate commerce.[3] I begin with a discussion of appellees' lack of standing.

## II.

### A.

Although the State of Florida did not challenge appellees' standing in the district

---

**1.** The Attorney General of the State of Florida, Jim Smith, was also named as a defendant in the complaint, but the district court entered an order on August 29, 1985 dropping him as a party, pursuant to appellees' unopposed motion.

**2.** The supremacy clause provides as follows:
   This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby; any Thing in the Constitution or

Laws of any State to the Contrary notwithstanding.
U.S. Const. art. VI, cl. 2.

   The commerce clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3.

**3.** In light of my conclusion that appellees lack standing, I do not address whether the State of Florida has waived its eleventh amendment, sovereign-immunity defense.

court,[4] we are obliged to examine this issue *sua sponte* because the jurisdiction of this court and the district court must be founded on the existence of a "case or controversy" under article III of the Constitution. *See Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977) ("Although raised by neither of the parties, we are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III, to seek injunctive relief in the District Court."); *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("In its constitutional dimension, standing ... is the threshold question in every federal case, determining the power of the court to entertain the suit.").

"Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (citation omitted). In this case, the statutory schemes of both the Clean Air Act and the Safety Act, as well as the special importation regulations applicable to gray market automobiles, must be examined to determine the nature of the injury, if any, appellees have suffered as a result of the enactment of Fla.Stat. § 320.02(9).

### B.

The Clean Air Act authorizes the Environmental Protection Agency (EPA) to regulate and establish standards applicable to the emission of any air pollutant from motor vehicles. 42 U.S.C. § 7521(a) (1982).

The Clean Air Act also prescribes specific standards applicable to the emission of carbon monoxide, hydrocarbons, and oxides of nitrogen. *See, e.g., id.* §§ 7521(a)(3)(A)(ii), 7521(b)(6)(A). These standards must be implemented when the EPA administrator determines that they are technologically feasible, "giving appropriate consideration to the cost of compliance." *Id.* § 7521(a)(2).

To enforce the scheme of federal regulation mandated by the Clean Air Act, Congress directed the EPA to test or require the testing of any new motor vehicle[5] submitted by a manufacturer, to determine whether the vehicle conforms with section 7521 and the regulations promulgated under that section. *Id.* § 7525(a)(1). If the prototype vehicle complies with the applicable emission standards, the EPA must issue to the manufacturer a "certificate of conformity" that covers the class of motor vehicles represented by the prototype. *Id.* § 7525(a). Section 7525(b) authorizes the EPA to develop testing procedures to assess whether the manufacturer has designed and produced a motor vehicle that is in actual compliance with governing emission standards. The certificate of conformity is a condition precedent to the initial retail sale of any new motor vehicle because a manufacturer is prohibited from selling, importing, or otherwise introducing into commerce a vehicle that is not covered by such a certificate. *Id.* § 7522(a)(1).

By enacting these provisions, Congress made a deliberate policy choice concerning the enforcement of federal emission standards. Congress did not provide, for example, for the testing of *every* new motor vehicle produced for use in the United

4. The standing issue was first addressed by amicus curiae Mercedes–Benz of North America, Inc. in its brief before this court.

5. For purposes of the Clean Air Act provisions, the term "new motor vehicle" is defined as follows:

Except with respect to vehicles or engines imported or offered for importation, the term "new motor vehicle" means a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser; and the term "new motor vehicle engine" means an engine in a new motor vehicle or a motor vehicle engine the equitable or legal title to which has never been transferred to

the ultimate purchaser; and with respect to imported vehicles or engines, such terms mean a motor vehicle and engine, respectively, manufactured after the effective date of a regulation issued under section 7521 of this title which is applicable to such vehicle or engine (or which would be applicable to such vehicle or engine had it been manufactured for importation into the United States).

42 U.S.C. § 7550(3) (1982). Thus, the term "new motor vehicle" includes the category of post-Clean Air Act automobiles imported into the United States, whether they are in fact new or pre-owned.

States. Rather, it authorized the EPA to issue a certificate of conformity to manufacturers whose prototype vehicle complies with the emission standards. Under section 7541, the manufacturer is then required to warrant to the consumer that its motor vehicle is designed, built, and equipped to comply with the applicable emission standards. *Id.* § 7541(a).

Congress recognized, however, that some of the automobiles operated in the United States are gray market automobiles manufactured for sale and use abroad and were not designed to comply with American emission standards. Accordingly, the Clean Air Act bars the importation of motor vehicles that do not comply with applicable federal emission standards. *See* 42 U.S.C. § 7522(a) (1982) (prohibiting "importation into the United States" of motor vehicles not in compliance with the Clean Air Act); *id.* § 7522(b)(2) ("A new motor vehicle ... offered for importation or imported by any person in violation of [section 7522(a)] shall be refused admission into the United States...."). The EPA has provided a limited exemption from the requirements of the Clean Air Act for automobiles manufactured overseas. An importer is entitled to an automatic once-in-a-lifetime exemption from the Clean Air Act's emission standards, provided that the vehicle is more than five years old, is imported for personal use and not for resale, and will not be sold within two years after importation. United States EPA, *Automotive Imports–Fact Sheet* 76 (1983).

In enacting this comprehensive scheme for federal regulation of motor vehicle emissions, Congress believed that national standards were necessary to permit manufacturers to obtain economies of scale in the design and production of automobiles, and to prevent the application and administration of emission standards for "new motor vehicles" by each of the fifty states. *See* H.R.Rep. No. 728, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Admin. News 1938, 1955–58. Accordingly, Congress passed the following provision to preempt state emission regulations:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to [the vehicle emission standards of the Clean Air Act]. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a).[6] Nonetheless, "[n]othing in [the vehicle emission standards of the Clean Air Act] shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." *Id.* § 7543(d).

C.

In 1966, Congress enacted the Safety Act "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (1982). To achieve this purpose, Congress directed the Secretary of Transportation, through the

---

6. The EPA is authorized to waive application of the preemption provision in certain limited circumstances:

The Administrator [of the EPA] shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiv-

er shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

42 U.S.C. § 7543(b)(1) (1982). Only the state of California has sought and obtained waiver of preemption under the Clean Air Act.

National Highway Traffic Safety Administration (NHTSA), to establish federal motor vehicle safety standards. *Id.* § 1392(a); *see* 49 C.F.R. § 501.2 (1986). After consideration of relevant motor vehicle safety data, the NHTSA is authorized to issue safety standards that take into account the reasonableness, practicability, and appropriateness of the standards, and the extent to which the standards further the purposes of the Safety Act. 15 U.S.C. § 1392(f) (1982). The NHTSA has promulgated standards for a variety of vehicle features, such as bumpers, doors, windshields, and seat belts.

The Safety Act provides for a self-certification procedure, under which every motor vehicle manufacturer or distributor must furnish to dealers and distributors a certification that each of its motor vehicles conforms to all applicable federal motor vehicle safety standards. *Id.* § 1403. The Act prohibits the sale, offer for sale, manufacture for sale, or importation into the United States of any motor vehicle manufactured after the effective date of an applicable motor vehicle safety standard, unless the vehicle conforms with that safety standard.[7] *Id.* § 1397(a)(1)(A). In addition, any vehicle not conforming with the Safety Act is to be refused admission into the United States. *Id.* § 1397(b)(3). In contrast to the Clean Air Act, the Safety Act has no once-in-a-lifetime exemption for automobiles imported for personal use. *See generally* United States EPA, *Automotive Imports–Fact Sheet* 76 (1983).

Like the Clean Air Act, the Safety Act contains a preemption provision, which provides as follows:

Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.

*Id.* § 1392(d).

## D.

Despite its general prohibition against the importation of nonconforming motor vehicles into the United States, Congress has authorized the importation of gray market automobiles upon the furnishing of a bond or other means of assuring that federal environmental and safety laws are not circumvented unlawfully.[8] The EPA,

---

7. This prohibition does not apply "to the sale, the offer for sale, or the introduction or delivery for introduction in interstate commerce of any motor vehicle or motor vehicle equipment after the first purchase of it in good faith for purposes other than resale." 15 U.S.C. § 1397(b)(1) (1982).

8. Under the Clean Air Act,

the Secretary of the Treasury and the Administrator [of the EPA] may, by joint regulation, provide for deferring final determination as to admission and authorizing the delivery of such a motor vehicle or engine offered for import to the owner or consignee thereof upon such terms and conditions (including the furnishing of a bond) as may appear to them appropriate to insure that any such motor vehicle or engine will be brought into conformity with the standards, requirements,

and limitations applicable to it under this part. The Secretary of the Treasury shall, if a motor vehicle or engine is finally refused admission under this paragraph, cause disposition thereof in accordance with the customs laws unless it is exported, under regulations prescribed by such Secretary, within ninety days of the date of notice of such refusal or such additional time as may be permitted pursuant to such regulations, except that disposition in accordance with the customs laws may not be made in such manner as may result, directly or indirectly, in the sale, to the ultimate consumer, of a new motor vehicle or new motor vehicle engine that fails to comply with applicable standards of the Administrator under this part.

42 U.S.C. § 7522(b)(2) (1982).

Similarly, the Safety Act provides as follows:

the Department of Transportation (DOT), and the Treasury Department have promulgated regulations governing the importation of motor vehicles that do not comply with the Clean Air Act and the Safety Act.[9] Under these regulations, a noncomplying automobile is conditionally admitted into the United States for the limited purpose of enabling the importer to comply with federal emission and safety laws.[10] The importer of record must post an entry bond with the United States Customs Service (Customs) equal to the value of the vehicle plus the customs duty. *See* Automobile Importers Compliance Ass'n, *Handbook of Vehicle Importation* 21 (1984) [hereinafter AICA Handbook]. In addition, the importer must sign a statement indicating that the motor vehicle "is not covered by a certificate of conformity with federal motor vehicle emission standards but will be brought into conformity with such standards." 19 C.F.R. § 12.73(b)(5)(x) (1987). Finally, the importer must declare that the automobile "was not manufactured in conformity [with] all applicable safety standards, but it has been or will be brought into conformity." *Id.* § 12.80(b)(iii). The entry bond requirement serves to enforce the importer's obligation to comply with the requirements of federal emission and safety standards. Thus, Customs will not release the bond until it receives assurances from the EPA and the NHTSA that the importer has complied with the standards. *See id.* §§ 12.73(c), 12.80(e).

Once the automobile has been conditionally admitted into the United States by Customs, it is released into the custody of the importer. The conditions of this release are crucial to the determination of appellees' standing in this case. Under EPA regulations, an automobile conditionally admitted into the United States "shall be stored and shall not be operated on the public highways or sold until such vehicle or engine has been granted *final admission.*" 40 C.F.R. § 85.1507 (1986) (emphasis added); *see also Georgia Auto. Importers Compliance Ass'n v. Bowers,* 639 F.Supp. 352, 354 n. 2 (N.D.Ga.1986) (order granting preliminary injunction) ("EPA regulations state that a nonconforming vehicle conditionally admitted must be stored and must not be sold or operated on the public highways until the vehicle has been granted final admission.") (citation omitted); *Direct Auto. Imports Ass'n v. Townsley,* No. H–85–3610 (S.D.Tex. Oct. 18, 1985) [Available on WESTLAW, DCT database] ("[T]he EPA specifically requires [that] the vehicle ... must not be operated on the highways except for purposes of modification and testing until the bonds are

> [T]he Secretary of the Treasury and the Secretary [of the DOT] may, by ... regulations, provide for authorizing the importation of such motor vehicle or item of motor vehicle equipment into the United States upon such terms and conditions (including the furnishing of a bond) as may appear to them appropriate to insure that any such motor vehicle or item of motor vehicle equipment will be brought into conformity with any applicable Federal motor vehicle safety standard prescribed under this subchapter, or will be exported or abandoned to the United States.
>
> 15 U.S.C. § 1397(b)(3) (1982).

**9.** During this appeal, the EPA substantially overhauled its regulations concerning the importation of gray market automobiles. *See generally* Notice of Final Rule–Making, 52 Fed.Reg. 36,-136 (1987) (to be codified at 40 C.F.R. § 85.1501). The new regulations, effective July 1, 1988, eliminate the once-in-a lifetime exemption for vehicles greater than five years old, limit most importing activity to independent certified importers (ICI's), alter the testing and modification requirements, and impose a 15-day holding period on imported vehicles. Accordingly, many of the regulations discussed in the opinion will no longer apply after July 1, 1988.

On September 29, 1987, amicus curiae Mercedes–Benz of North America filed with this court a supplemental brief arguing that the EPA's change in regulations rendered this dispute moot. With respect to appellee Sims, the new regulation will have no effect. Nor does the EPA action, by itself, render this dispute moot with respect to FICA's claim for declaratory judgment. Even if FICA is unable to obtain certificates for importation and is therefore unable to import after July 1, 1988, it is still entitled to import vehicles under the current regulations until that date.

**10.** An importer can also bring a noncomplying automobile into the United States by meeting one of the other available exceptions to the compliance requirements of the Clean Air Act and Safety Act. *See, e.g.,* 19 C.F.R. §§ 12.-73(b)(5)(i)–(ix), (xi); 12.80(b)(1)(i), (ii), (iv)–(ix), (b)(2), (f) (1987). These exceptions are not relevant to the case before us.

released.") (citation omitted), *rev'd in part on other grounds,* 804 F.2d 1408 (5th Cir. 1986); AICA Handbook, *supra,* at 22 ("It is important to note that the only reason the vehicle has been released is to permit modifications necessary to bring the vehicle into compliance with emission and safety standards. The vehicle is not to be used on the streets and highways, except for delivery to ·the modifier....").[11] The term "final admission," as used in the EPA regulations, refers to the unconditional admission of the vehicle into the United States and the release of the entry bond by Customs, which occurs after the EPA and the NHTSA assure Customs that the vehicle complies with each agency's regulations. *See* AICA Handbook *supra,* at 8, 10, 18, 26 (final admission occurs after Customs receives bond release letters from the EPA and NHTSA and the duty is liquidated). Thus, until the importer has completed the compliance process prescribed by the EPA, he is prohibited by EPA regulations from operating or selling the imported automobile.

Under DOT regulations, an automobile conditionally admitted into the United States may not be sold or offered for sale until NHTSA assures Customs that the vehicle has been "brought into conformity with all applicable safety regulations." 19 C.F.R. § 12.80(b)(1)(iii) (1987). The DOT regulations are silent with regard to whether it is permissible to *operate* the imported automobile prior to final admission.

In order to obtain release of the entry bond and final admission of the vehicle by Customs, the importer must satisfy the requirements of both the EPA and the NHTSA. Within five days of conditional admission of the vehicle, the importer or consignee of the vehicle must submit to the EPA a written request for permission to modify the vehicle so that it will conform with applicable emission standards.[12] 40 C.F.R. § 85.1504(a) (1986). The EPA then sends the importer a "Dear Importer" letter, which informs him of the methods by which he can comply with the requirements of the EPA's import regulations. If the importer cannot utilize the one-time exemption granted by the EPA, he must demonstrate through modification and testing of the vehicle that it complies with applicable Clean Air Act standards. Once the EPA is satisfied that the vehicle is exempt or is in actual compliance, it will send to Customs a bond release letter, which informs Customs that the emission regulations have been satisfied.

The importer must also comply with the requirements of the Safety Act and the regulations issued by the DOT. Within 120 days of conditional admission of the vehicle into the United States, or within 180 days if the NHTSA grants a sixty-day extension,

---

**11.** EPA regulations also prohibit the storage of a noncomplying automobile on the premises of, or subject to access or control by, any automobile dealer. 40 C.F.R. § 85.1504 (1986).

**12.** The importer's written request must contain the following:

(1) A statement, acceptable to the Administrator [of the EPA], that specifies the modifications which are necessary to render the vehicle or engine in conformity with a test vehicle or engine for which a certificate of conformity has been issued; or, if the vehicle or engine cannot be modified to bring it within a class of vehicles or engines represented by a test vehicle or engine for which a certificate of conformity has been issued, the request shall state that the importer or consignee will demonstrate that the vehicle or engine is in conformity with applicable emission standards or family particulate emission limits, as defined in [40 C.F.R. Part 86 (1984) ] by testing the vehicle or engine or causing it to

be tested in accordance with test procedures prescribed under section 206 of the Act in effect during (and applicable to) the model year of such vehicle.

(2) The date by which the modifications will be accomplished;

(3) Identification of the place where the vehicle or engine will be stored pending a determination of conformity under this paragraph: *Provided,* That such vehicle or engine shall not be stored on the premises of, or subject to access by or control of any dealer;

(4) An acknowledgement of responsibility for the custody of the vehicle or engine while the modifications are being made and while a determination of conformity is pending; [and]

(5) Authorization for representatives of the Environmental Protection Agency to inspect or test the vehicle or engine at any reasonable time for the purpose of making a determination of conformity....

40 C.F.R. § 85.1504(a) (1986).

the importer or consignee must submit to the NHTSA a statement containing the following: (1) the identity of the person who brought the vehicle into conformity with the Safety Act; (2) the exact nature and extent of the modifications performed; (3) certification that the vehicle complies with the Safety Act; and (4) certification that the vehicle will not be sold or offered for sale until the NHTSA "issues an approval letter to the district director [of Customs] stating that the vehicle ... has been brought into conformity with all applicable safety standards." 19 C.F.R. § 12.80(b)(1)(iii) (1987). Once the NHTSA is satisfied that the vehicle is in actual compliance with the Safety Act, it sends a bond release letter to Customs.

When Customs receives a bond release letter from both the EPA and the NHTSA, it grants final admission for the vehicle, completing the importation process. At that point, and not before, the importer is permitted to operate the vehicle and, unless he is importing the vehicle under his one-time exemption from the Clean Air Act, to sell the vehicle. An importer who fails to comply with EPA and DOT import regulations may be subjected to a number of penalties. Customs can require that he forfeit the entry bond, 19 C.F.R. §§ 12.73(c), 12.80(e), 113.62(i)(1) (1987), export the noncomplying vehicle, or return it to Customs for disposition, *id.* §§ 12.73(e), 12.80(e). In addition, the importer may be liable for a fine of up to $10,000.

### III.

Having determined the rights and obligations of importers of gray market automobiles, I now examine whether appellees have such a personal stake in the outcome of this controversy to have standing to challenge Florida's requirement that these automobiles be certified by the EPA and the DOT prior to titling and registration. The constitutional requirement of standing has four elements. First, the plaintiff must show that he has suffered actual or threatened injury caused by the allegedly illegal conduct of the defendant. *Valley Forge Christian College v. Americans*

*United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)). Second, the plaintiff's injury must be fairly traceable to the challenged action. *Id.* (citing *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). Third, the injury must be "likely to be redressed by a favorable decision." *Id.* (quoting *Simon,* 426 U.S. at 38, 96 S.Ct. at 1924). Finally, the injury must be judicially cognizable. *See Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed. 2d 556 (1984) ("Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?"); *see also Valley Forge,* 454 U.S. at 472–74, 102 S.Ct. at 758–59.

Even if a plaintiff meets the constitutional requirements for standing, we must determine whether prudential limits on the exercise of federal jurisdiction should prevent his claim from going forward. *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324; *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 760. For example, the plaintiff should normally assert his own legal rights and interests, not the rights of third parties. *Id.* at 474, 102 S.Ct. at 760 (citing *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205). In addition, the federal courts should refrain from adjudicating generalized grievances that present "abstract questions of wide public significance." *Id.* at 475, 102 S.Ct. at 760 (quoting *Warth,* 422 U.S. at 500, 95 S.Ct. at 2206). "Finally, the [Supreme] Court has required that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.* (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

In the present case, appellees must show a judicially cognizable injury traceable to the Florida title and registration statute, which is likely to be redressed by a holding that the Florida statute is preempted or violates the commerce clause. The majority contends that appellees met these consti-

tutional requirements and have standing to challenge the Florida law requiring proof of compliance with federal safety and emissions standards. I disagree with this conclusion because I fail to see how appellees have been injured by the enactment of the Florida statute. Accordingly, I would find that neither Sims nor FICA has standing, under either the Clean Air Act or the Safety Act, to challenge the Florida statute.

The sole injury allegedly suffered by appellee Sims and the individual members of appellee FICA is their inability to title and register gray market automobiles before final admission. This fails to constitute a cognizable injury, however, because the only purpose for which title and registration is sought is to enable the owner to drive or sell the vehicle, and these activities are prohibited by federal law until the vehicle is granted final admission.

Under Florida law, a certificate of title is necessary for the sale and operation of a motor vehicle within the state. Fla.Stat. §§ 319.21, 319.34 (Supp.1987).[13] With regard to vehicle registration, Florida law provides that "every owner or person in charge of a motor vehicle which is operated or driven on the roads of this state shall register the vehicle in this state." Fla.Stat. § 320.02(1) (Supp.1987). Moreover, "[n]o registration is required for any motor vehicle which is not operated on the roads of

---

**13.** Fla.Stat. § 319.21 (Supp.1987) provides in relevant part as follows:

(1) No manufacturer, distributor, licensed dealer, or other person shall sell or otherwise dispose of a new motor vehicle or a new mobile home to a distributor, licensed dealer, or other person without delivering to such distributor, licensed dealer, or other person a manufacturer's statement of origin duly executed and with such assignments thereon as may be necessary to show title in the purchaser thereof, on forms approved by the department; nor shall any distributor, licensed dealer, or other person purchase, acquire, or bring into the state, except for temporary use and not for sale, a new motor vehicle or a new mobile home wihtout obtaining from the seller thereof the manufacturer's statement of origin....

(2) No person shall sell or otherwise dispose of a motor vehicle or mobile home without delivering to the purchaser or transferee thereof a certificate of title with such assignment thereon as may be necessary to show title in the purchaser. No person shall purchase or otherwise acquire or bring into the state a motor vehicle or mobile home, except for temporary use, unless such person obtains a certificate of title for it in his name in accordance with the provisions of this chapter. However, any licensed dealer may, in lieu of having a certificate of title issued in his name, reassign any existing certificate of title issued in this state. If no certificate of title exists on a motor vehicle or mobile home in this state and if the vehicle is not a new motor vehicle or a new mobile home requiring a manufacturer's statement of origin under the provisions of this section, the dealer shall, over his signature, briefly note the fact of nonexistence of a certificate of title and show the name and address of the party from whom the vehicle or mobile home was obtained on the face of the separate application for initial certificate of title which is made by the purchaser or transferee. It shall not be necessary for any licensed dealer to obtain a certificate of title on any new motor vehicle or new mobile home which he is selling or which he acquires for sale if he obtains a manufacturer's statement of origin as provided in subsection (1); however, the dealer shall attach the manufacturer's statement of origin to the separate application for initial certificate of title which is made by the purchaser and certify on the face of such application that the vehicle is a new motor vehicle or new mobile home and shall also disclose the name and address of the manufacturer, distributor, or other person from whom he acquired such motor vehicle or mobile home.

Fla.Stat. § 319.34 (Supp.1987) provides as follows:

Whoever, except as otherwise provided for .in this chapter, purports to sell or transfer a motor vehicle or mobile home without delivering to the purchaser or transferee thereof a certificate of title thereto duly assigned to such purchaser as provided in this chapter or operates or uses in this state a motor vehicle or mobile home for which a certificate of title is required without such certificate having been obtained in accordance with the provisions of this chapter, or upon which the certificate of title has been canceled; whoever fails to surrender any certificate of title, certificate of registration, license plate, or sticker upon cancellation of the same by the department and notice thereof as prescribed in the chapter; whoever fails to surrender the certificate of title to the department as provided in this chapter in case of the destruction or dismantling or change of a motor vehicle or mobile home in such respect that it is not the motor vehicle or mobile home described in the certificate of title; or whoever violates any of the other provisions of this chapter, or any lawful rule adopted pursuant to the provisions of this chapter, shall be fined not more than $500 or imprisoned for not more than 6 months, or both, for each offense.

this state during the registration period." *Id.* Thus, the sole purpose of vehicle registration is to permit the operation of automobiles on Florida's roads.

I fail to understand how the majority can conclude that appellees have been "injured" by the enactment of the Florida statute. Under EPA regulations, appellees have no right to operate or sell the vehicle until the provisions of the Clean Air Act and the Safety Act are met and Customs grants final admission. As I noted in my description of the automobile importation process, a gray market automobile is granted conditional admission into the United States solely for the purpose of modification of its emission and safety features. Customs will grant the vehicle final admission only when it receives assurances from the EPA and the NHTSA that the vehicle complies with federal emission and safety standards. Until the vehicle is granted final admission, the EPA requires that the automobile "shall be stored and shall not be operated on the public highways." 40 C.F.R. § 85.1507 (1986). Moreover, EPA regulations prohibit the sale of the vehicle prior to final admission. *Id.*

As I stated above, the sole purpose of titling and registration of a vehicle in Florida is to permit the sale and operation of the vehicle on Florida's roads. The Florida statute simply prevents titling and registration, i.e., the sale or operation of a vehicle, until federal emissions standards are met. In effect, the Florida statute challenged by appellees does nothing more than prohibit what is already prohibited under the Clean Air Act. Therefore, I cannot agree that appellees have been "injured" by the Florida statute.

Appellees were not "injured" with respect to the Safety Act's provisions, either. The majority, in its conclusion that the Florida statute is not preempted by the Safety Act, finds that the Florida statute does nothing more than enforce the requirements of the Safety Act. *Ante* at 1567 ("Fla.Stat. § 320.02(9) ... imposes [no] additional requirements or burdens on the manufacturer or importer [than those already imposed by the Safety Act].").

This conclusion—that appellees are "injured" by a Florida statute which, as the majority admits, goes no farther in restricting appellees' conduct than does the Safety Act—perplexes me.

I also believe that the mere inability to obtain the title and registration *documents* themselves is too speculative a ground on which to base appellees' standing. *Cf. Allen v. Wright,* 468 U.S. 737, 753–56, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984) (parents seeking to challenge failure of Internal Revenue Service to deny tax-exempt status to racially discriminatory private school lacked standing because they failed to allege harm involving a concrete, personal right); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) (plaintiffs lacked standing because "they failed to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees"); *Warth v. Seldin,* 422 U.S. 490, 507–08, 95 S.Ct. 2197, 2209–10, 45 L.Ed.2d 343 (1975) (plaintiffs seeking to challenge exclusionary zoning practices lacked standing because they failed to allege "specific, concrete facts demonstrating that the challenged practices harm [them], and that [they] personally would benefit *in a tangible way* from the court's intervention") (emphasis added).

The majority nevertheless asserts that appellees are sufficiently "injured" by their inability to get the title and registration documents themselves. *Ante* at 1563–64. The majority then speculates that "[a] possible alternative need the owner of a gray market vehicle may have for a certificate of title is the securing of bank financing to assist in the purchasing of the automobile." *Ante* at 1564 n. 9. This assertion is insufficient to create standing, for two reasons.

First, any such injury is wholly speculative. Neither Sims nor FICA alleged any such injury relating to financing. A federal court cannot create its own jurisdiction by imagining what injury the plaintiff

might have suffered. Rather, the burden is on the *plaintiff* to allege concrete injury that is "'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical'." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (citations omitted).

I also believe that the majority's conclusion that appellees have been injured through their inability to obtain financing, *see ante* at 1564 n. 9, is unsupportable because it contradicts common sense. Assuming, as the majority has, that an owner would need financing for his automobile *after* it arrives in the United States, the lack of title and registration would not be the cause of the owner's inability to obtain financing. An automobile that is conditionally admitted into the United States is subject to a Customs bond, which is not released until Customs officials receive release letters from both the EPA and the NHTSA. If the required safety and emissions requirements are not met within 180 days, Customs officials may seize the vehicle and export or destroy it. 19 C.F.R. §§ 12.73(c), (e), 12.80(e)(2), (i) (1987). I find it hard to believe that a potential financier would consider issuing a substantial loan secured only by a vehicle subject to imminent seizure, export, or destruction. The customer's ability to produce only a foreign title document or bill of sale, rather than Florida title and registration documents, is not the cause of the customer's inability to obtain financing. Any impediment to financing is the result of federal law and the required customs bond, not Florida title and registration statutes.

The Florida statute merely adopts and enforces existing federal standards, in no way inhibiting appellees' conduct or causing them harm.[14] Because appellees have not alleged any concrete, specific injury, they have created a hypothetical case, one which the federal courts are not empowered to decide under article III of the Constitution. The majority violates this fundamental rule of article III jurisdiction by accepting all too readily appellees' conclusory statements of "injury," *see ante* at 1563–64, fortifying its finding of actual injury with speculations of its own, *see ante* at 1564–65 & n. 9, and then placing the burden on the State of Florida to disprove these allegations of injury. *See ante* at 1563. Accordingly, I would dismiss the case for lack of standing.

### IV.

I would also dismiss this action as moot, at least with respect to appellee Sims. The majority holds that her action is not moot, however, because it agrees with the State of Florida's concession that Sims' injury is "capable of repetition yet evading review." *Ante* at 1570. Because mootness implicates the court's jurisdiction under the case-or-controversy requirement of article III, the parties' agreement that the case is not moot and their desire to litigate the merits cannot relieve this court of its duty to determine for itself whether a case is now moot. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974).

On September, 18, 1985—three months before the lower court issued its opinion in this case—the NHTSA issued its bond release letter, authorizing Customs to proceed with final admission of Sims' vehicle. Sims now has the documents necessary to comply with Fla.Stat. § 320.02(9) and obtain title and registration for her vehicle. Accordingly, Sims no longer has a personal stake in the outcome of this appeal, and her action is now moot. The majority, however, holds that her case is not moot because it is "capable of repetition yet evad-

14. The gist of appellees' argument may be that they are "injured" because, prior to the enactment of the Florida statute, the gray market prohibitions were only enforced by federal authorities, but now that Florida has enacted section 320.02(9), appellees are subject to both state and federal enforcement of the federal law. In other words, appellees may be asserting that they have an implied right to violate federal law, and that "right" has been encroached by the State of Florida. This "right to violate federal law" would, of course, have to be a *federal* right in order to transcend Florida law; in short, an *implied* federal right to violate *express* federal law, giving appellees standing to challenge a Florida statute that merely adopts the express federal law. This would be a difficult argument to swallow indeed.

ing review." *Ante* at 1570. I believe that this exception to the mootness doctrine is not applicable to this case.

In *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), the Supreme Court defined the showing necessary to fall within the "capable of repetition yet evading review" exception to the mootness doctrine. The Supreme Court stated that

> in the absence of a class action, the "capable of repetition, yet evading review" doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

*Id.* at 149, 96 S.Ct. at 349. In the present case, Sims fails to fall within this exception because she fails to fulfill the second requirement, i.e., her cause is not "capable of repetition." Sims has not alleged that she intends to import another noncomplying automobile and seek title and registration in Florida. At most, there is only a physical or theoretical possibility that she will do so. A mere possibility, however, is not enough to fulfill the second prong of the mootness exception. *Murray v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183–84, 71 L.Ed.2d 353 (1982). Rather, in order to be sufficiently "capable of repetition," "there must be a 'reasonable expectation' or 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Id.* (quoting *Weinstein*, 423 U.S. at 149, 96 S.Ct. at 348). Accordingly, Sims' cause of action is not "capable of repetition yet evading review," and I would dismiss her case as moot.[15]

### V.

In light of my conclusions that both appellees lack standing to challenge the Florida statute, and that appellee Sims' cause of action is moot, I should refrain from discussing the merits. Nonetheless, I am compelled to respond to the majority's conclusion that Fla.Stat. § 320.02(9) violates the commerce clause of the United States Constitution because the majority, overlooking commerce clause precedent, restricts the states' power to regulate interstate commerce when Congress has authorized them to do so.

The commerce clause acts as both an explicit grant of power to Congress to regulate interstate commerce and an implicit limitation on state authority preventing the states from unduly interfering with interstate commerce. *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 652, 101 S.Ct. 2070, 2074, 68 L.Ed.2d 514 (1981). The commerce clause, however, does not bar all state statutes that interfere with interstate commerce. Where a statute is narrowly drawn to regulate matters of local concern, that statute will not be struck down unless its impact on interstate commerce outweighs the state regulatory concern promoted by the statute. *Kassell v. Consolidated Freightways Corp.*, 450 U.S. 662, 670–71, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981). Nor does the commerce clause bar state regulation where Congress has chosen to *allow* state regulation of an aspect of interstate commerce. "Congress, if it chooses, may exercise [its commerce clause] power indirectly by conferring upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44, 100 S.Ct. 2009, 2020, 64 L.Ed.2d 702 (1980). If Congress has conferred such power on the states, any state

---

**15.** Sims argues that her case is not moot because the Florida Department of Highway Safety and Motor Vehicles (DMV) might still refuse to issue Sims her registration and title documents, even though she has received all the federal documents required by section 320.-02(9). This contention, however, is insufficient to save her cause of action from a dismissal on mootness grounds. If the officials at DMV still refuse to issue the documents, they are in violation of section 320.02(9), and Sims' recourse is to bring a suit for mandamus to compel the issuance of the documents, not to maintain this action challenging the constitutionality of the statute.

statute promulgated pursuant to this authorization "is rendered invulnerable to Commerce Clause challenge." *Western & Southern Life Ins. Co.*, 451 U.S. at 652–53, 101 S.Ct. at 2075.

I disagree with the majority's conclusion that Florida Stat. § 320.02(9) violates the commerce clause because I find that Congress has generally authorized the states to engage in the sort of regulation provided by the Florida statute. As the majority recognizes, *ante* at 1565–68, the Safety Act authorizes state enforcement of the federal standards. *See* 15 U.S.C. § 1392(d) (1982) (preempting any state standard "which is not identical to the federal standard"); S.Rep. No. 505, 97th Cong., 2d Sess. 6, *reprinted in* 1982 U.S.Code & Admin. News 3169, 3174 (states are not barred from enforcing federal Safety Act standards). Accordingly, I believe that Fla. Stat. § 320.02(9) is invulnerable to commerce clause challenge, insofar as section 320.02(9) enforces the Safety Act.

Section 320.02(9), however, also seeks to enforce the provisions of the Clean Air Act. The proper approach, therefore, is to examine the *incremental* burden caused by section 320.02(9)'s enforcement of the Clean Air Act. This incremental burden on interstate commerce is, at best, nominal.

Any gray market automobile brought into the United States cannot be operated or sold until it is brought into conformity with Clean Air Act standards. This restric-tion applies no matter into which state the vehicle is brought. The only burden on interstate commerce imposed by Florida that is not imposed by other states is that gray market automobiles arriving in Florida ports cannot be titled or registered until Clean Air Act requirements are met. As I have stated, I cannot perceive, nor do appellees aver, any legitimate reason why an owner would need to have title and registration before he is able, under *federal* law, to operate or sell his gray market vehicle. There simply is no rational, legal reason why an importer would be discouraged from importing a gray market automobile into Florida as opposed to another state. Accordingly, I disagree with the majority's conclusion that "[t]he Florida Statute directs the stream of commerce in gray market vehicles from Florida to other states for those owners who have legitimate reasons for registering and titling their vehicles before being able to use them on the roads of Florida," *ante* at 1569, and would find no commerce clause violation resulting from the incremental burden created by Florida's enforcement of Clean Air Act requirements.